**TERREBONNE, LTD. OF CALIFORNIA,**
Plaintiff,

v.

Ronald W. MURRAY, et al., Defendants.

No. CIV–F–95–5296 OWW DLB.

United States District Court,
E.D. California,
Fresno Division.

Jan. 23, 1998.

MEMORANDUM OPINION RE: ORDER TO SHOW CAUSE WHY SANCTIONS SHOULD NOT BE IMPOSED AGAINST FORMER ATTORNEYS OF RECORD AND LAW FIRMS FOLLOWING DISQUALIFICATION FROM FURTHER REPRESENTATION OF PLAINTIFF; AND ORDER

WANGER, District Judge.

## I. INTRODUCTION

This matter is before the court on an order to show cause why sanctions should not be imposed against attorneys Kenneth S. Bayer, Timothy D. McCollum and the law firms of McCollum, Bayer & Bunch, and Bayer, Cutsinger & Lopez,[1] following disqualification of these lawyers and their law firms as attorneys of record for plaintiff Terrebonne Ltd. of California.

## II. BACKGROUND

The court's order disqualifying the attorneys and law firms (collectively referred to herein as the "disqualified attorneys") was entered on August 6, 1997, following the court's memorandum decision detailing the facts upon which the motion to disqualify was granted.[2] The grounds justifying the disqualification order were the following:

1. Undertaking representation of a new client (the New Hogan investors) whose interests presented an actual conflict of interest with a current client (Terrebonne), arising because of their competing interests in the subject real property, without first obtaining the affected parties' informed consent.

2. Failing to provide evidence that the disqualified attorneys adequately explained the conflict of interest resulting from the dual representation and received the informed consent of all affected parties to proceed with the dual representation.

3. Directly contacting a represented party in the litigation, Charles Boggs or New Hogan investors who are noteholder-limited partners rather than noteholder-creditors.

4. Acquiring confidential information regarding New Hogan's litigation strategy and settlement position through a misleading communication with New Hogan's attorney, and subsequently conveying that information and using it to advance Terrebonne's position in the litigation.

After issuance of an order to show cause, two separate evidentiary hearings were held

1. Formerly Bayer and Cutsinger.

2. The Memorandum Decision of August 6, 1997, is incorporated by this reference.

at which the disqualified attorneys were provided the opportunity to present evidence as to why they should not be sanctioned for conduct found by the court to be in violation of recognized rules of professional conduct and the relevant court rules and statutes applicable to the conduct of attorneys practicing in federal court.

### III. LEGAL STANDARD

■ The district court has the duty and responsibility to supervise the conduct of attorneys who appear before it. *Erickson v. Newmar Corp.*, 87 F.3d 298, 301 (9th Cir. 1996); *Lockary v. Kayfetz*, 974 F.2d 1166, 1170 (9th Cir.), *cert. denied, sub nom., Pacific Legal Foundation v. Kayfetz*, 508 U.S. 931 113 S.Ct. 2397, 124 L.Ed.2d 298 (1993); *Trust Corp. v. Piper Aircraft Corp.*, 701 F.2d 85, 87 (9th Cir.1983). The power of federal judges to impose sanctions for abuses of process is quite broad. In *Gas–A–Tron of Ariz. v. Union Oil Co.*, 534 F.2d 1322 (9th Cir.), *cert. denied sub nom. Shell Oil Co. v. Gas a Tron of Ariz.*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976), the court stated:

> Whenever an allegation is made that an attorney has violated his moral and ethical responsibility, an important question of professional ethics is raised. It is the duty of the district court to examine the charge, since it is that court which is authorized to supervise the conduct of the members of its bar. The courts, as well as the bar, have a responsibility to maintain public confidence in the legal profession. This means that a court may disqualify an attorney for not only acting improperly but also for failing to avoid the appearance of impropriety.

534 F.2d at 1324–25.

■ The district court's power to sanction derives from several sources: federal statute, Local Rules of Court, and its inherent power. "For a sanction to be validly imposed, the conduct in question must be sanctionable under the authority relied on." *Cunningham v. County of Los Angeles*, 879 F.2d 481, 490 (9th Cir.1988) (internal quotations omitted),

*cert. denied*, 493 U.S. 1035, 110 S.Ct. 757, 107 L.Ed.2d 773 (1990).

### A. *POWER TO SANCTION FOR ATTORNEY MISCONDUCT UNDER LOCAL RULES OF THE EASTERN DISTRICT*

The Local Rules of the Eastern District, L.R. 83–184 provides:

> In the event any attorney subject to these Rules engages in conduct which may warrant discipline or other sanctions, any Judge ... may initiate proceedings for contempt under 18 U.S.C. § 401 or Fed. R.Crim.P. 42, or may, after reasonable notice and opportunity to show cause to the contrary, take any other appropriate disciplinary action against the attorney. In addition to or in lieu of the foregoing, the Judge ... may refer the matter to the disciplinary body of any Court before which the attorney has been admitted to practice.

L.R. 83–184(a) (1997).

The court's criminal contempt power arising under § 401 of Title 18 authorizes the court "to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other as—(1) [m]isbehavior of any person in its presence or so near thereto as to obstruct the administration of justice...." Under Rule 42, contempt is criminally punishable "if the judge certifies that the judge saw or heard the conduct constituting the contempt or that it was committed in the actual presence of the court." Fed. R.Crim.P. 42(a).

Neither the Local Rules nor the Federal Rules provide as clear a definition of "other appropriate disciplinary action," for instances when attorney digressions do not constitute or warrant criminal contempt. However, district judges do have an "arsenal of sanctions" they can impose for unethical behavior. *Erickson v. Newmar Corp.*, 87 F.3d at 303. These sanctions include monetary sanctions, contempt and the disqualification of counsel. *Id.* In addition, the court may look for appropriate sanctions under the Rules of Professional Conduct and State Bar Rules of California.[3] *See* L.R. 83–180(e) (adopting

---

3. Title IV of the Rules of Procedure of the State Bar sets forth the range of appropriate sanctions for acts of professional misconduct:

California Rules of Professional Conduct and decisions of any Court applicable thereto as standards of professional conduct in Eastern District courts); *see also, e.g., Frazier v. Heebe*, 482 U.S. 641, 645, 107 S.Ct. 2607, 96 L.Ed.2d 557 (1987) (district courts have clear statutory authority to promulgate rules governing the admission and conduct of attorneys who appear before them).

## B. *POWER TO SANCTION DERIVED UNDER FEDERAL STATUTE*

The statutory basis for awarding sanctions is found at 28 U.S.C. § 1927. Section 1927 provides in pertinent part:

Any attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C.S. § 1927 (1989).

■ The Ninth Circuit has stated that "[b]ecause [ ] section [1927] authorizes sanctions only for the "multipli[cation of] proceedings," it applies only to unnecessary filings and tactics once a lawsuit has begun." *In re Keegan Management Co. Sec. Litig. (Keegan Management Company v. Moore)*, 78 F.3d 431, 435 (9th Cir.1996). Indeed, the term "vexatious" has been defined as "lacking justification and intended to harass." *Overnite Transp. Co. v. Chicago Ind. Tire Co.*, 697 F.2d 789, 795 (7th Cir.1983) (citing Webster's Int'l Dictionary (1971) and *United States v. Ross*, 535 F.2d 346 (6th Cir.1976)). Sanctions awarded pursuant to § 1927 must be based upon a finding that the sanctioned attorney acted in subjective bad faith. *United States v. Blodgett*, 709 F.2d 608, 610 (9th Cir.1983); *New Alaska Development Corp. v. Guetschow*, 869 F.2d 1298, 1306 (9th Cir. 1989). Subjective bad faith requires the court to find that the attorney knowingly or recklessly advanced a frivolous position, or a

meritorious position for the purpose of harassing an adversary. *See In re Keegan*, 78 F.3d at 436; *Salstrom v. Citicorp Credit Serv., Inc.*, 74 F.3d 183 (9th Cir.1996), *cert. denied, sub nom., Webb v. Citicorp Credit Serv. Inc.*, —— U.S. ——, 117 S.Ct. 60, 136 L.Ed.2d 23 (1996); *MGIC Indemnity v. Moore*, 952 F.2d 1120 (9th Cir.1991); *Toombs v. Leone*, 777 F.2d 465 (9th Cir.1985) (court not required to make express findings as to counsel's state of mind because record contained sufficient evidence to support decision). As the court in *Keegan* states:

For sanctions to apply, if a filing is submitted recklessly, it must be frivolous, while if it is not frivolous, it must be intended to harass. Thus, while it is true that reckless filings may be sanctioned, and nonfrivolous filings may also be sanctioned, reckless nonfrivolous filings, without more may not be sanctioned.

78 F.3d at 436.

■ Section 1927 requires some element of wrongful purpose. *See Blodgett*, 709 F.2d at 610. "Bad faith is present when an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent." *West Coast Theater Corp. v. City of Portland*, 897 F.2d 1519, 1528 (9th Cir.1990) (citing *Cunningham v. County of Los Angeles*, 879 F.2d 481, 490 (9th Cir.1988)); *New Alaska*, 869 F.2d at 1306. Sanctions are warranted only if actions are so completely without merit as to require the conclusion that they must have been undertaken for an improper purpose such as delay. *See Shafii v. British Airways, PLC*, 83 F.3d 566, 569 (2d Cir. 1996).

■ Under § 1927, the decision to award sanctions is a matter within the court's sound discretion. *Wages v. Internal Revenue Service*, 915 F.2d 1230, 1235 (9th Cir.), *cert*

Subject to these standards and the rules and laws which govern attorney disciplinary proceedings conducted by the State Bar, the following sanctions are available upon a finding or acknowledgment by a member of professional misconduct:
(a) Admonition.
(b) Reproval.

(c) Suspension from the practice of law.
(d) Disbarment.
(e) Any interim remedies or final discipline as authorized by section 6007(h), Business and Professions Code.
Rules of Procedure, Title IV, Part A, Standard 1.4.

*denied,* 498 U.S. 1096, 111 S.Ct. 986, 112 L.Ed.2d 1071 (1991).

### C. *POWER TO SANCTION DERIVED UNDER DISTRICT COURT'S INHERENT AUTHORITY TO PUNISH ATTORNEY MISCONDUCT*

 While the district court should issue sanctions under a rule or statute if possible, *Lockary v. Kayfetz,* 974 F.2d at 1170; it is not so limited and has discretion to rely on its inherent powers to sanction attorney misconduct. *In re Akros Installations, Inc.,* 834 F.2d 1526, 1532 (9th Cir.1987).

 Sanctions imposed under the court's inherent power requires a specific finding of bad faith. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 55, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 767, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980); *Yagman v. Republic Ins.,* 987 F.2d 622, 628 (9th Cir.1993) (In sanctioning counsel, "[c]ourts may not invoke [inherent] powers without a 'specific finding of bad faith'") (quoting *United States v. Stoneberger,* 805 F.2d 1391, 1393 (9th Cir.1986)); *Zambrano v. City of Tustin,* 885 F.2d 1473, 1478 (9th Cir.1989) ("To insure that restraint is properly exercised, we have routinely insisted upon a finding of bad faith before sanctions may be imposed under the court's inherent power.") "A finding of bad faith 'does not require that the legal and factual basis for the action prove totally frivolous; where a litigant is substantially motivated by vindictiveness, obduracy, or *mala fides,* the assertion of a colorable claim will not bar assessment of attorneys' fees.'" *Mark Ind., Ltd. v. Sea Captain's Choice, Inc.,* 50 F.3d 730, 732 (9th Cir.1995) (quoting *Lipsig v. National Student Marketing Corp.,* 663 F.2d 178, 181 (D.C.Cir.1980)). Under the court's inherent power to monitor the conduct of attorneys appearing before it, sanctions based on recklessness alone are legally insufficient. *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990); *Newton v. Thomason,* 22 F.3d 1455, 1463 (9th Cir.1994). When the court's inherent power to sanction is invoked, the court must exercise discretion in fashion-

ing an appropriate sanction. *Erickson,* 87 F.3d at 303 (citing *Chambers,* 501 U.S. at 44–45.)

## IV. DISCUSSION

### A. *ATTORNEY BAYER CONTENDS NO CONTACT WITH CHARLES BOGGS EVER OCCURRED; THE DISQUALIFIED ATTORNEYS CONTEND THE COURT'S DISQUALIFICATION ORDER IS BASED ON A FAULTY PREMISE*

The disqualified attorneys assert that Kenneth Bayer did not contact or speak with Charles Boggs, New Hogan's general partner. The disqualified attorneys contend none of the evidence before the court on the motion to disqualify showed that Mr. Boggs was contacted by Bayer. Mr. Bayer asserts for the first time in response to the order to show cause that he did not speak with Mr. Boggs personally.[4]

The relevant portion of Boggs' Declaration states: "In November of 1996, I learned that Kenneth S. Bayer, counsel for some of the New Hogan investors, wished information concerning this lawsuit and I instructed that any and all information he requested be provided to him." This statement is ambiguous concerning whether Bayer directly contacted Boggs in 1996. How Mr. Boggs "learned" of attorney Bayer's desire for information regarding the Terrebonne litigation was explained at the evidentiary hearing. Mr. Boggs and Mr. Bayer testified at the hearing concerning the issue of contact between them. Their testimony is diametrically opposed as to whether Messrs. Bayer and Boggs spoke directly.

Mr. Boggs testified that in October 1996, Mr. Bayer called his office, identified himself as an attorney representing certain New Hogan Lake Investors, and asked questions regarding New Hogan's involvement in litigation. Boggs testified he offered information that New Hogan was involved in litigation with Terrebonne and was represented by Mr. Hassen of the law firm, Miller, Starr & Regalia. Mr. Boggs testified he did not remem-

---

**4.** The disqualified attorneys did not seek reconsideration of the disqualification order.

ber details of the conversation, including who answered the telephone when Mr. Bayer called, or the date and time of the conversation.

Mr. Bayer testified that no such conversation ever occurred. Additionally, Mr. Bayer and Mr. McCollum have filed under seal all telephone records for the period October–November 1996. CRE Equity Investors' telephone number, (916) 961–7757, does not appear in any of the records. There is a considerable dispute as to whether the conversation described by Boggs ever occurred. Mr. Hassen's declaration shows that he was told by Mr. Boggs that an attorney for New Hogan investors would be calling and to provide him with information sought. Following these instructions, Mr. Hassen returned Mr. Bayer's telephone call on November 8, 1996,

and discussed matters concerning New Hogan's litigation and settlement strategy in the Terrebonne litigation. Mr. Hassen's actions corroborate Mr. Boggs' testimony.

■ Accepting, *arguendo*, the disqualified attorneys' position that no contact ever took place with Mr. Boggs, Mr. Bayer nonetheless concealed the true identity of his interests from New Hogan and its attorneys until after he elicited and obtained confidential information.[5] Even if no direct contact occurred, as Mr. Bayer contends, disqualification was justified and sanctions warranted based on this inappropriate conduct, which meets the subjective bad faith standard. The Rules of Professional Conduct expressly forbid such misleading contact with Mr. Hassen in which Mr. Bayer portrayed the inter-

---

5. In his declaration in support of the disqualification motion, Michael Hassen asserts he spoke openly with Mr. Bayer regarding New Hogan's litigation strategy and settlement position and that Mr. Bayer did not identify himself at any time as a consulting attorney for Terrebonne. Mr. Bayer does not refute this statement. Mr. Hassen also asserts at the end of the conversation, Mr. Bayer stated he was planning to join the McCollum law firm. Mr. Bayer could not recall at what point during the conversation this topic arose. The court has found that confidential information was disclosed by Mr. Hassen to Mr. Bayer and that Mr. Bayer failed to disclose his allegiance to Terrebonne prior to eliciting those confidences.

In determining the standard of care owed in a legal malpractice action, California courts often rely on expert testimony. *See e.g., Gerard v. Ross*, 204 Cal.App.3d 968, 987–88, 251 Cal.Rptr. 604 (1988) (observing "[t]o determine the validity of [a malpractice] allegation, the trier of fact is entitled to the benefit of expert evidence as to the proof of the prevailing standard of skill and learning in the same or similar locality and the propriety of particular conduct by the practitioner."); *Lipscomb v. Krause*, 87 Cal.App.3d 970, 151 Cal.Rptr. 465 (1978) (in legal malpractice action, proof of relative issues generally required testimony of experts as to standard of care and consequences of breach). Although not an attorney malpractice action, the court finds expert opinion and testimony relevant and helpful in determining the conflict issues involved. New Hogan submitted the Declaration of Attorney Paul Vapnek of the law firm Townsend, Townsend & Crew, as expert testimony regarding the relevant standard of conduct to which the disqualified attorneys should have complied. The disqualified attorneys have not countered Mr. Vapnek's written expert testimony with declarations of their own expert. Mr. Vapnek's declarations provide pertinent evidence of the standard

of care to which the disqualified attorneys were to subscribe.

Attorney Paul Vapnek, New Hogan's professional responsibility expert stated: "Having obtained confidential information about New Hogan, Mr. Bayer is obligated to maintain that information in confidence and not use it to the disadvantage of the party from whom it was obtained. This means that Mr. Bayer cannot continue to represent Terrebonne. This case is analogous to the situation of a former client about whom a lawyer has confidential information. Rule 3–310(E) precludes a lawyer from using confidential information without the former client's informed written consent.... While New Hogan was not a client of Mr. Bayer, Mr. Bayer represented that he was the lawyer for several of the investors who stand substantially in the same position as New Hogan in the litigation." *See Vapnek Declaration*, Doc. # 200, ¶ 17. The court agrees.

Ethical canons and the common law prohibit the representation of adverse parties in circumstances, like those presented here, where an attorney who has acted as such for one side purports to render professional services in the same case to the other side. *See, e.g.* ABA Model Code of Professional Responsibility DR 5–105. Moreover, an attorney should not render professional services to an adverse party "in any event, whether it be in the same case or not, [because the attorney must not] assume a position hostile to his client, and one inimical to the very interests he was engaged to protect; and it makes no difference in this respect, whether the relation itself has been terminated, for the obligation of fidelity and loyalty still continues." *Smiley v. Director, Office of Workers Compensation Programs*, 984 F.2d 278, 282 (9th Cir.1993) (quoting *In re Boone*, 83 Fed. 944, 952 (C.C.N.D.Cal. 1897)).

ests of his "New Hogan clients" as aligned with Mr. Hassen's client, the partnership. Mr. Bayer did not disclose that he was contemplating adverse action against the New Hogan limited partnership, not just Mr. Boggs. Additional bases for disqualification included Mr. Bayer's inadequate disclosure to New Hogan investors the nature of the actual conflict of interests between Terrebonne and the New Hogan investors; Mr. Bayer's undertaking representation of both Terrebonne and New Hogan investors without obtaining the informed written consent of all affected clients; and Mr. Bayer's undertaking representation of New Hogan investors before full and adequate written disclosure of actual and potential conflicts was made and the New Hogan investors properly referred to truly independent counsel.

B. *THE DISQUALIFIED ATTORNEYS REQUEST TO REVIEW MICHAEL HASSEN'S SEALED DECLARATION IN ORDER TO REBUT THE FINDING THAT CONFIDENTIAL INFORMATION WAS ELICITED BY MR. BAYER*

The disqualified attorneys assert they have not been permitted to review attorney Hassen's sealed declaration to defend against the allegations he makes. Mr. Hassen's declaration details the confidential information provided to Mr. Bayer about New Hogan's litigation strategy and settlement position, which would not have been communicated had Mr. Bayer fully disclosed his representation of Terrebonne. Mr. McCollum also asserts in his supplemental declaration that Mr. Hassen has misrepresented Terrebonne's settlement position to the court.

The disqualified attorneys assert to refuse them the opportunity to review Mr. Hassen's declaration is a denial of due process and that they could not respond to the order to show cause unless permitted to cross-examine witnesses and review relevant evidence upon which the court relied. As authority for the right to procedural due process, the disqualified attorneys cite *Rosenthal v. Justices of the Supreme Court of California*, 910 F.2d 561 (9th Cir.), *cert. denied*, 498 U.S. 1087, 111 S.Ct. 963, 112 L.Ed.2d 1050 (1991).[6] There, the Ninth Circuit found that procedural due process rights of an attorney subject to disbarment were provided for under California law. That is not the case here. This is not a case proceeding under Cal. Bus & Prof Code § 6083. More importantly, Mr. Hassen was present at both evidentiary hearings. The disqualified attorneys did not call Mr. Hassen as a witness nor did they cross-examine him on these subjects.

 Sanctions cannot be imposed without notice, an opportunity to respond, and a hearing. *Kirshner v. Uniden Corp. of America*, 842 F.2d 1074, 1082 (9th Cir.1988). The form which those procedural protections must take is determined by an evaluation of all the circumstances and an accommodation of competing interests. *Tom Growney Equip., Inc. v. Shelley Irrigation Development, Inc.*, 834 F.2d 833, 835 (9th Cir.1987) (finding subsequent hearing on motion to alter or amend judgment imposing sanctions failed to satisfy due process) (citing *Goss v. Lopez*, 419 U.S. 565, 579, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975)). When sanctionable conduct occurs outside the presence of the court, counsel should be provided an opportunity to explain the conduct. *Blodgett*, 709 F.2d at 610. Here that opportunity has been extensively afforded. The court gave notice by issuing an order to show cause re sanctions and held two separate evidentiary hearings. The court offered all parties the opportunity to submit any evidence. In response to the disqualified attorneys' concerns, the court or-

---

**6.** In *Rosenthal*, the court stated that a lawyer disciplinary proceeding is not a criminal proceeding, citing *Standing Comm. on Discipline v. Ross*, 735 F.2d 1168, 1170 (9th Cir.), *cert. denied*, *appeal dismissed*, 469 U.S. 1081, 105 S.Ct. 583, 83 L.Ed.2d 694 (1984). Accordingly, "normal protections afforded a criminal defendant do not apply. The principle of presumption of innocence is a creature of criminal proceeding; and hence, does not apply in a lawyer disbarment proceeding. Similarly, Section 6083(c) [Cal. Bus & Prof Code] does not violate the command of the 14th Amendment that the state prove every element of an offense beyond a reasonable doubt. That command, which arises from *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), applies only in criminal proceedings, not in a lawyer disbarment such as this one." *Rosenthal*, 910 F.2d at 565.

dered disclosed to them every provision of the Hassen declaration on which the court relied in deciding the recusal and sanctions issues.

The Ninth Circuit recognizes that an evidentiary hearing on a matter for which a party is sanctioned for abuse of the discovery process *might* be allowed where the party seeks to show that it was impossible to comply with the court's discovery orders. *United States v. Westinghouse Elec. Corp.*, 648 F.2d 642, 652 (9th Cir.1981). This is not a case where a party is being sanctioned for failure to comply with a court order. The disqualified attorneys have not cited legal authority to support their claim for enhanced procedural protections.

In *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 592 (9th Cir.1983), the court stated: "When necessary, the district court may hold an evidentiary hearing on a motion for sanctions. Indeed, that method best determines the appropriate sanctions while protecting a party's due process rights." The local rules do not provide pre-hearing discovery nor have the disqualified attorneys cited any authority which requires a full trial. Nonetheless, they have in effect been afforded a trial on the merits, after notice, where witnesses were sworn and testified, evidence was received, and oral and written arguments presented.

In determining the need to discover the contents of Mr. Hassen's sealed declaration, the need for the information is balanced against New Hogan's right to keep attorney-client privileged communications and attorney work-product protected materials confidential.

▆▆▆ The attorney-client privilege protects communications made in confidence by the client in the course of seeking legal advice from a lawyer in his capacity as such, and applies only when invoked by the client and not waived. *United States v. Abrahams*, 905 F.2d 1276, 1283 n. 10 (9th Cir.1990), *overruled on other grounds, United States v. Jose*, 131 F.3d 1325 (9th Cir.1997); *Tornay v. United States*, 840 F.2d 1424, 1426 (9th Cir. 1988). The privilege encourages clients to make full disclosure to their attorneys. *Upjohn Co. v. United States*, 449 U.S. 383, 389,

101 S.Ct. 677, 66 L.Ed.2d 584 (1981). The party claiming the privilege must show the privilege applies. *Abrahams*, 905 F.2d at 1283.

> The privilege extends only to communications and not to facts. A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a state of such fact into his communication to his attorney.

*Upjohn Co.*, 449 U.S. at 395–96 (citation omitted).

▆▆▆ Under California law, the attorney-client privilege is waived when the client, "disclose[s] a significant part of the communication or has consented to such disclosure by anyone," Cal. Evid.Code § 912; or the client places "in issue" the contents of the communication with its attorney. *See Rockwell International Corp. v. Superior Court*, 26 Cal.App.4th 1255, 1268, 32 Cal.Rptr.2d 153 (1994). There has been no disclosure of privileged communications here by clients, who hold the privilege. Mr. Hassen was induced to reveal privileged confidential information that constituted his work-product. All relevant information contained in Mr. Hassen's declaration relied on by the court has been disclosed to all parties.

▆▆▆ The statements Mr. Hassen made to Mr. Bayer, which Mr. Hassen claims constituted disclosure of his confidential settlement strategy and his confidential legal opinions about the case are work-product. The work-product doctrine provides an independent basis upon which litigants may rely to protect an attorney's trial preparation thoughts and materials. *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). The doctrine prevents attorneys from benefitting from the fruit of an adversary's labor. The work-product doctrine provides qualified not absolute protection, which, like other qualified privileges, may be waived. *United States v. Nobles*, 422 U.S.

225, 239–40, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975).

 Mr. Hassen has invoked the work-product privilege; it is the disqualified attorney's burden to overcome it, *Hickman*, 329 U.S. at 512; *see In re Grand Jury Investigation*, 599 F.2d 1224, 1230 (3d Cir. 1979); by showing substantial need for the specific information or that the materials or their substantial equivalent are unattainable by other means without undue hardship. *Holmgren v. State Farm Mutual Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir.1992). In any event, the work-product doctrine shelters the mental processes of the attorney and the attorney's agents, "providing a privileged area within which he can analyze and prepare his client's case." *Nobles*, 422 U.S. at 238.

Due process is afforded by permitting the disqualified attorneys to obtain the facts contained in Mr. Hassen's sealed declaration which were relied upon by the court.[7] Those facts are as follows:

1. In November 1996, Mr. Hassen was contacted by Mr. Bayer of the law firm, Bayer & Cutsinger, who identified himself as counsel for certain investors of New Hogan. On November 8, 1996, Mr. Hassen returned Mr. Bayer's call upon the understanding Mr. Boggs wished to cooperate with all New Hogan investors.[8] Mr. Hassen answered Mr. Bayer's questions about the Terrebonne litigation, title insurance coverage for the dispute, and concerning duty of defense negotiations with the title insurer. Mr. Bayer did not disclose that he was a consulting attorney for Terrebonne. It was not until the end of the conversation that Mr. Bayer told Mr. Hassen he was considering joining the McCollum law firm.

2. Mr. Hassen disclosed to Mr. Bayer his confidential evaluation that New Hogan had determined the value of the real property encumbered by Terrebonne's deed of trust and the amount of Terrebonne's settlement offer differed by some $500,000 or more.

3. Mr. Hassen disclosed the title insurer contemplated pulling its defense of New Hogan following success on the motion for partial summary judgment and entry of judgment on the quiet title, declaratory relief and injunctive relief claims; that New Hogan would likely not have the funds to continue the lawsuit, but that Mr. Boggs was certain he could pool additional resources from the investors.[9] Mr. Hassen disclosed that the title insurance policy excepted senior liens from coverage. Mr. Hassen explained his litigation strategy was to "lay low" and work towards an informal resolution before the title insurer's defense was pulled.

4. Mr. Hassen expressed concern to Mr. Bayer about New Hogan's pending motion for summary judgment because Terrebonne had a senior deed of trust on the property. Mr. Hassen explained that New Hogan could prevent Terrebonne from foreclosing on the property, but that Terrebonne's superior interest in the land precluded an easy settlement.

5. Mr. Hassen states that much of this information, includes his litigation strategy, legal opinions and legal evaluation of the case, and is all privileged.

6. Mr. Hassen alleged that Terrebonne used the information he provided Mr. Bayer to oppose New Hogan's summary judgment motion, although Terrebonne had not previously shown any awareness how it could defeat New Hogan's summary judgment motion.

7. Mr. Hassen's sealed declaration has been redacted by the court and provided to the disqualified attorneys for their consideration. The entire unredacted declaration will be maintained under seal as Court Exhibit 1 for review by any higher court.

8. As Mr. Hassen states in his declarations before the court, he was instructed by Mr. Boggs to cooperate with all New Hogan investors and their attorney. This is evidence that corrobo-

rates the alleged prior phone conference between Boggs and Bayer.

9. Mr. Bayer did not disclose to Mr. Hassen that it was upon Mr. DeGravel's suggestion that Mr. Bayer contacted New Hogan investors and Mr. Boggs, suggested Mr. Boggs' removal as general partner of New Hogan, and recommended an involuntary bankruptcy petition against New Hogan, all of which would thwart Mr. Hassen's settlement strategy for New Hogan.

Following release of Mr. Hassen's redacted declaration to the disqualified attorneys, Mr. Bayer provided a copy of an October 2, 1996 letter to Mr. Hassen in which he states "some of the Investors received limited partnership shares. In this regard, I have been consulted regarding an action to dissolve New Hogan Lake Investors and to remove the partnership's current general partner in the interim." Mr. Bayer asserts the letter demonstrates the adverse position taken by the investors against New Hogan, so as to put Mr. Hassen on notice that his conversation should be guarded.[10] Mr. Bayer asserts that the later telephone conversation with Mr. Hassen was similarly "guarded." Mr. Bayer, however, did not tell Mr. Hassen that Mr. Hassen should exercise caution in dealing with Mr. Bayer because Mr. Bayer represented Terrebonne.

As determined in the decision disqualifying the attorneys, all New Hogan limited partners are represented in the Terrebonne litigation by Mr. Hassen of Miller, Star, that partnership's attorneys.[11] The October 2, 1996 letter references the Terrebonne litigation, but does not disclose Mr. Bayer then was a legal consultant for Terrebonne and its attorneys. This is precisely the type of misleading contact which induced Mr. Hassen to make confidential disclosures. Mr. Bayer stated at the conclusion of the letter:

the Investors, whether as direct assignees of New Hogan Lake Investors' rights in the real property, or as residual distributees in a partnership dissolution, also deem themselves to be successors in interest to the partnership's rights as an insured under the policy of title insurance issued by First American Title Insurance Company. As such, their participation in, and written assent to, any settlement of claims pertaining to the status of title will be required. Any agreement entered into between First American Title Insurance Company and New Hogan Lake Investors without the Investors' participation and assent will be null and void as it pertains to them.

This letter admits the conflict. This demand is a request for cooperation, which if honored by Mr. Hassen would have naturally resulted in the disclosure of confidential information.[12] Mr. Bayer represented in the letter that the investor group he purported to represent had to approve the settlement, and were aligned with New Hogan generally. In fact, whether the limited partners had individual approval authority for settlement of the lawsuit is not certain under Cal.Corp.Code § 15632 or the limited partnership agreement. However, the noteholder-investors had no such right. They were creditors, not co-owners with the limited partnership of the real property, even their liquidation preference did not give them the legal right to approve a settlement by the limited partnership of the Terrebonne suit. Mr. Bayer's statement was misleading as to New Hogan investors, who were noteholders.

Normally, a creditor's interests are adverse to its debtor where a debt is delinquent and unpaid. The October 2, 1996 letter only mentions the prospect of New Hogan investors taking adverse action against New Hogan as debtor. Mr. Bayer states "I have been consulted regarding an action to dis-

10. Whether Mr. Hassen received the October 2, 1996 letter is disputed. In his declarations filed under penalty of perjury, Mr. Hassen asserts he did not receive this letter. He has made similar statements in open court and before the bankruptcy judge. In any event, the letter is another example of Mr. Bayer's failure to disclose that Mr. Bayer was engaged in ongoing consulting work for Terrebonne while at the same time attempting to advance the interests of the New Hogan investors. The court finds Mr. Hassen's declaration as more credible.

11. In making this finding, New Hogan's expert Mr. Vapnek aptly comments: "It appears that Mr. Bayer made contact with each of the investors in New Hogan without obtaining the consent of Mr. Hassen or any other lawyer in his firm despite knowing that the investors' interests, if not the investors themselves, are represented by Mr. Hassen and his firm." *Vapnek Decl.*, ¶ 16.

12. The expert's declaration points out the problem with Mr. Bayer's conduct: "Mr. Bayer represented that he was the lawyer for several of the investors who stand substantially in the same position as New Hogan in the litigation." *See Vapnek Decl.*, ¶ 17. As officers of the court, the disqualified attorneys are under a duty to avoid the appearance of impropriety as well as actual unethical conduct. *See Erickson*, 87 F.3d at 303. Here, the disqualified attorneys' decision to directly contact and to undertake representation of New Hogan investors, given their representation of Terrebonne in this litigation, both has the appearance of and is improper.

solve New Hogan Lake Investors and to remove the partnership's current general partner in the interim." *See* Exh. B to Bayer's Third Supp. Decl. (Nov. 24, 1997). Such action could only be taken by New Hogan limited partners, who were then represented by Mr. Hassen in the Terrebonne lawsuit. However, rather than explaining the investors' adverse position, Mr. Bayer's letter demands that New Hogan and its attorneys cooperate with him and his New Hogan investor-clients to settle title to the real property. Mr. Bayer failed to disclose that his first loyalty was to Terrebonne. His belief that Terrebonne's interest was the same as New Hogan investors' interests in the Terrebonne litigation can only be supported if the legal positions advanced by Mr. Hassen for New Hogan are ignored. Mr. Hassen's defense of New Hogan in the Terrebonne litigation was adverse to Terrebonne.

 If Messrs. Bayer and McCollum had properly analyzed the law of partnership and professional responsibility, they would not have permitted Mr. Bayer to embark on such conflicted dual representation of New Hogan investors and limited partner. Obtaining confidential information by deceit and then using such information in litigation to the detriment of the New Hogan limited partnership, a party whose interests are alleged to be aligned with Mr. Bayer's current New Hogan investor clients, violates the California Rule of Professional Conduct 3–310(E). Such conduct caused the need for the recusal proceedings. This course of conduct was legally unjustified; it knowingly or recklessly advanced a meritless legal position, and wrongfully multiplied the proceedings.

---

**13.** This statement is patently false. In both the Second and Third Amended Complaints, Terrebonne alleges the transfer of property to New Hogan was fraudulent and that Terrebonne is and must be deemed owner of the entire parcel. In correspondence between Mr. McCollum and Mr. Hassen in 1996, Mr. McCollum asserts that New Hogan's interest in the property is invalid or voidable. *See* Exh. B, C, F to New Hogan's Additional MP & A (Nov. 7, 1997). Under the bankruptcy plan, Terrebonne as of 1988, was to obtain a lot line adjustment from Calaveras County. Terrebonne has elected not to do so.

**14.** The expert's own independent review of this case reached a similar conclusion regarding the

## C. THE DISQUALIFIED ATTORNEYS ASSERT TERREBONNE CAN NEVER TAKE TITLE TO THE 652 ACRES OWNED BY NEW HOGAN; THE DISQUALIFIED ATTORNEYS CONTEND PLACING NEW HOGAN INTO BANKRUPTCY WOULD NOT HAVE RESULTED IN A "NO ASSET" BANKRUPTCY

The disqualified attorneys assert Terrebonne "has long recognized New Hogan as the owner of 652 acres of the 2,824 acre parcel." The disqualified attorneys contend that following the court's October 5, 1995 decision granting the County of Calaveras' motion to dismiss, Terrebonne conceded New Hogan's ownership to the 652 acres.[13] The disqualified attorneys assert: 1) the disclosures made to the New Hogan investors gave a "realistic view" of the "likely outcome" for the litigation; 2) that Terrebonne has not asserted the failure to procure a lot line adjustment as a basis upon which to divest New Hogan of its property interest; 3) that the court's finding that the involuntary petition against New Hogan filed in the bankruptcy court would result in a "no asset" bankruptcy is erroneous,[14] and that if no lot adjustment is made, New Hogan and Terrebonne hold the property as tenants in common. The disqualified attorneys also claim the Bankruptcy Judge's finding in the hearing and subsequent order dismissing the involuntary bankruptcy petition against New Hogan, that the only party benefitting from the bankruptcy is Terrebonne, was "dicta." However, the Bankruptcy Judge used that finding, among others, to terminate that involuntary bankruptcy proceeding.[15]

In the proceedings in this court, the disqualified attorneys take the court's com-

---

"no asset bankruptcy" issue. Mr. Vapnek states: "Based upon the facts as I understand them, Kenneth S. Bayer should have been aware of the conflict of interest inherent in attempting to represent investors of New Hogan while at the same time attempting to strip those investors in the only security backing their investment. Any actions Mr. Bayer and his firms take to help Terrebonne directly and adversely affects the very investors Mr. Bayer and his firms are now representing." *See Vapnek Decl.,* ¶ 9.

**15.** In findings of fact and conclusions of law dismissing the involuntary petition against New Hogan filed by Mr. Bayer on behalf of certain

ments regarding a "no asset" bankruptcy out of context. The comments form a basis for disqualification when viewed from the eyes of an unknowing client, to whom the disqualified attorneys owed a duty of full disclosure of relevant facts.[16] The court's cognizance of "what is actually transpiring in this case" has come from its decisions in this case over the last two years, while Terrebonne's counsel have needlessly multiplied the proceedings in this and other courts.

The disqualified attorneys acknowledged at the hearing on the order to show cause that if Terrebonne recovers the 652 acres because the sale to Thousand Hills is declared fraudulent, *ab initio*, they would apply to Calaveras County to reduce the tax basis of the entire real property, without regard to New Hogan as a subsequent transferee. The disqualified attorneys have no credible response to the analysis, that if after forcing New Hogan into involuntary bankruptcy, Terrebonne succeeds in its efforts to recover the 652 acres, and the County forecloses its tax lien before any lot line adjustments are approved, New Hogan will be without assets.[17]

The following facts are not reasonably disputed: (1) New Hogan derives its interest in

---

New Hogan investors as petitioners, Judge McManus made findings:

10. Terrebonne is not a creditor of New Hogan. The deed of trust and note held by Terrebonne as executed by Thousand Hills, so Terrebonne has no privity of contract with New Hogan.

11. The only persons not being paid are Petitioners, and possibly those similarly situated in the partnership. ...

12. The only beneficiary of the Involuntary Petition is Terrebonne.
...

16. This Involuntary Petition holds no practical benefit for the Petitioners. To the extent Petitioner are entitled to payment, they are going to have to with for the 650± acres to be sold. The 650± acres must be untangled from the remaining 2,200± acreage in order for New Hogan to sell them. That will happen in the District Court Action. A bankruptcy will be [sic] impede the prosecution of the District Court Action.

17. Bayer represents both Petitioner and Terrebonne. Terrebonne could not have filed the Involuntary Petition because it is secured and because it is not a creditor of New Hogan. The Involuntary Petition could benefit Terrebonne but has no practical benefit to the Petitioners. The Involuntary Petition is being litigated primarily for the benefit of Terrebonne.

*See* Exh. B to Hassen Decl filed August 29, 1997 (Doc. # 250), findings of fact and conclusions of law dismissing involuntary bankruptcy petition, filed June 19, 1997. The decision of the bankruptcy judge is properly the subject of judicial notice. *See* Fed.R.Evid. 201; *Mullis v. United States Bankruptcy Ct.*, 828 F.2d 1385, 1388 (9th Cir.), *cert. denied*, 486 U.S. 1040, 108 S.Ct. 2031, 100 L.Ed.2d 616 (1988).

**16.** Both Judge McManus and the expert recognize that Mr. Bayer failed to adequately disclose the nature of the conflict of interest which existed by his purported representation of Terrebonne and the group of New Hogan investors. Mr. Vapnek concluded:

[I]t is my opinion that Kenneth S. Bayer and his firms ... have a clear conflict of interest if they are permitted to continue to represent the plaintiff Terrebonne in this case while simultaneously representing five current investors in the defendant New Hogan Lake Partners in the newly filed involuntary bankruptcy. Under common law rule applicable to attorneys, it is clear that an attorney cannot represent one client while at the same time suing that client. Mr. Bayer and his firms are representing Terrebonne against New Hogan, and effectively against the investors in New Hogan.

*See* Vapnek Decl., ¶ 8. At the hearing on the motion to dismiss the involuntary bankruptcy petition, Judge McManus stated:

Mr. Bayer, I am afraid your misery doesn't stop there. I reviewed your fee application that is set for hearing Monday in Terrebonne. I reviewed your fee-I mean your employment application, and you did not disclose in your employment application or in your fee application that you were representing these petitioning creditors. Basically, you represent two creditors of a debtor. Arguably. I have in mind I have said Terrebonne is not a creditor of New Hogan. But it does have an interest in some of its property. Okay. So you are representing two groups with claims of some nature against New Hogan. Shouldn't that have been disclosed?

*See* Exh. A, to Hassen's Decl. Of August 29, 1997, Transcript of Proceedings before Judge McManus, United States Bankruptcy Court, June 6, 1997, p. 14:19–15:5.

**17.** The disqualified attorneys' lack of understanding how their actions could result in a no asset bankruptcy, is due in large part to their failure to see how their loyalties have been compromised by undertaking the dual representation. In the usual case of successive representation, *see Trone v. Smith*, 621 F.2d 994 (9th Cir.1980), when there is a "reasonable probability that confidences were disclosed which could be used

the property through Thousand Hills, a now defunct entity, to which it loaned some $2,000,000 to purchase and develop approximately 2,824 acres, originally owned by Terrebonne. (2) The property was acquired from Terrebonne, when Terrebonne was in bankruptcy, upon the bankruptcy court's approval of sale of the real property to Thousand Hills. (3) Thousand Hills executed a purchase-money first deed of trust to Terrebonne, which contained a release clause. (4) The northerly 625 acres were to be conveyed to Thousand Hills free of Terrebonne's deed of trust under the release clause, as credit for Thousand Hills' initial payment to Terrebonne. (5) Terrebonne's purchase-money first deed of trust encumbers the balance of the 2,824 acre parcel. (6) To finance the purchase, Thousand Hills obtained a loan from New Hogan, and executed a blanket second deed of trust on the entire acreage to secure the loan from New Hogan. (7) New Hogan then held a senior security interest as to the 625 acres. Its security interest in the remainder of the real property is junior to Terrebonne. (8) In 1991, Thousand Hills defaulted on its loan, New Hogan foreclosed, and title to Thousand Hills' 652 acres was transferred to New Hogan.[18] (9) In this litigation, and a 1997–filed state court case, Terrebonne asserts that the transfer from it to Thousand Hills was void ab initio. (10) If Terrebonne prevails on this claim, New Hogan's transferee interest will be voided, as Mr. McCollum has claimed Thousand Hills never had the right, title or interest in the property to convey to New Hogan as security for New Hogan's loan.

Mr. McCollum pursued this now-admittedly meritless theory against New Hogan, after the October 5, 1995 ruling, by refusing in the spring of 1996 to sign a stipulation prepared by New Hogan's counsel to dismiss Terrebonne's quiet title action against New Hogan over the 652 acres.[19] Then the disqualified attorneys filed a state court lawsuit in 1997 advancing this void ab initio title theory against New Hogan. In diametric opposition, the disqualified attorneys argued at the order to show cause hearing that New Hogan is a bona fide purchaser without notice, not chargeable with Thousand Hills' "fraud," and New Hogan's interest in the 652 acres would not be disturbed by the voiding the original sale to Thousand Hills. Despite what Mr. Bayer now asserts, Mr. McCollum, on behalf of Terrebonne advocated a legally meritless theory in spring of 1996 in correspondence refusing to sign the stipulation to dismiss the quiet title cause of action against New Hogan, and as recently as spring of 1997, in filing a new state lawsuit asserting that the 652 acres should be returned to Terrebonne and title quieted in Terrebonne against New Hogan. The disqualified attorneys representation that Terrebonne does not claim the 652 acres as against New Hogan is directly contradicted by their conduct and the record.

Mr. McCullom's conduct needlessly multiplied and prolonged the proceedings as to New Hogan's efforts to resist Terrebonne's claims to the 652 acres.

against the client in later, adverse representation," a substantial relationship is presumed between the former and subsequent representation and the attorney faces a conflicted situation. See, id. at 998. But even if there is no sharing of confidences, "[t]he substantial relationship between the two representations is itself sufficient to disqualify." Id. at 999. The relationship between Terrebonne's interests and the New Hogan investors' interests is substantial. There are significant factual and legal similarities between the Terrebonne litigation and the involuntary bankruptcy. Both involve similar claims to the same property; both turn on a determination of validity of the transfer to Thousand Hills. The nature and extent of Mr. Bayer's involvement in the Terrebonne matter as a consultant was significantly more than "peripheral". See H.F. Ahmanson & Co. v. Salomon Brothers, Inc., 229 Cal.

App.3d 1445, 1454, 280 Cal.Rptr. 614 (1991); also Trone, 621 F.2d at 998 n. 3.

18. Terrebonne has litigated this case because of a dispute over the improper transfer of approximately 27 acres of land to Thousand Hills in alleged misdescription of the original 625 acre parcel deeded under the release clause of the original Thousand Hills purchase money deed of trust.

19. See, e.g., Exh. C to New Hogan's Additional MP & A filed November 7, 1997 (copy of Mr. McCollum's April 26, 1996 letter, stating "we believe the true sole owner of the 652 acres to be 1000 Hills. Consequently, to the extent that New Hogan asserts any claim to the 652 acres, we cannot dismiss the quiet title action against New Hogan.")

Terrebonne's 1997 quiet title complaint in the state court against New Hogan's acreage also would, if successful, divest New Hogan of its interest in the 652 acres. The disqualified attorneys represented to New Hogan investors in October and November of 1996 that it was in the investors' best interests to force New Hogan into bankruptcy, without simultaneously disclosing that in Spring of 1996, Mr. McCollum on behalf of Mr. Bayer's co-client, Terrebonne, was seeking to divest New Hogan of its only asset (the 652 acres). The investors were also not informed that Mr. McCollum intended to similarly pursue such a theory to divest New Hogan of its asset in Terrebonne's 1997 state lawsuit.

 In monitoring the conduct of attorneys before it and disciplining conduct which boasts of impropriety, the court may appropriately consider what the attorneys should have done with respect to the client, who has limited or no knowledge of all that has transpired in the case. *See Gas–A–Tron*, 534 F.2d at 1324–25.

> Whenever an allegation is made that an attorney has violated his moral and ethical responsibility, an important question of professional ethics is raised. It is the duty of the district court to examine the charge, since it is that court which is authorized to supervise the conduct of the members of its bar. The courts, as well as the bar, have a responsibility to maintain public confidence in the legal profession. This means that a court may disqualify an attorney for not only acting improperly but also for failing to avoid the appearance of impropriety.

*Erickson*, 87 F.3d at 303.

The disqualified attorneys' contention the court fails to understand the actual facts of this case is disingenuous. The complexity and confusion in this case has largely been caused by Terrebonne's unsuccessful legal maneuvers which have not advanced any party's interest, but have taken up substantial time and expense of the parties and judicial resources. The disqualified attorneys still have no awareness or understanding of the impropriety of their conduct in contacting New Hogan investors, one of whom, Buck Noel, was a limited partner, then represent-ed in the Terrebonne litigation by Mr. Hassen and the Miller, Starr law firm. Mr. Bayer purported to give the investors legal advice before early October 1996, without first making full and adequate disclosure and written reference to independent counsel before Mr. Bayer purported to take action on behalf of those investors, by contacting and wrongfully obtaining confidential attorney work-product information from Mr. Hassen.

### D. THE DISQUALIFIED ATTORNEYS ASSERT MR. BAYER'S DISCLO-SURE TO THE INVESTORS ADE-QUATELY INFORMED THEM OF ANY POTENTIAL FOR CONFLICT AND ADVISED THEM TO SEEK INDEPENDENT COUNSEL

Finally, the disqualified attorneys contend Mr. Bayer's letters to the investors adequately disclosed the nature of the conflict of interest between the investors and Terrebonne. The attorneys assert the November 9, 1996 letter adequately discloses the "worst case" scenario—that Terrebonne would recover the entire property. The December 18, 1996 letter informs the investors of their "right" to consult with other counsel. The disqualified attorneys state that the court's misconstruction of the letters stems from its view of the impossible—that Terrebonne could recover the entire parcel of land. If Terrebonne's pursuit of the 652 acres is "impossible," the disqualified attorneys have not explained why in April and May 1996 Mr. McCollum refused to stipulate to dismiss Terrebonne's legally meritless claims to the 652 acres against New Hogan in this lawsuit and why Terrebonne sued New Hogan in early 1997, he sued on behalf of Terrebonne in the state court to void the original transfer of the 652 acres. Mr. Bayer and Mr. McCollum now characterize the state suit as a "mistake," but offer no explanation for the spring 1996 refusal to dismiss the quiet title cause of action as to New Hogan.

The disqualified attorneys again misconstrue the court's prior decision. Mr. Bayer asserts the court concluded the investors were creditors of New Hogan and it was appropriate for him to speak with them. This is not true. On page 12 of that decision,

the court stated it was "reasonable" to conclude, based on the offering materials that note-investors were not limited partners of New Hogan but were creditors of the limited partnership. *See* Memorandum Decision Granting Motion to Disqualify Attorneys, filed August 6, 1997. The court also stated it is reasonable to conclude the interests of the note-investors and the limited partners were aligned because "[i]t is difficult to imagine a situation where it is not the goal of a creditor to maximize the success of the venture in which it has invested money." *Id.*, p. 13:23–25.

The court observed in the decision on page 18 that "to the extent the noteholders are creditors *without any equity interests* in New Hogan, Bayer's contact with them does not constitute contact with a represented party." *Id.*, p. 18:15–18. Mr. Bayer, however, failed to provide evidence to the court that only noteholders were contacted and the only New Hogan investors purported to be represented by him were creditors without any equity interests. Elsewhere, the court stated "[t]o the extent the noteholders are limited partners, Bayer's contact is a wrongful contact of a party represented by counsel in violation of Rule 2–100." *Id.*, p. 18:8–10. Mr. Bayer now admits he purported to represent Buck Noel who is a New Hogan limited partner, represented at that time in this case by Mr. Hassen.

Recently, the California Court of Appeals for the Second District determined that an attorney may not be sanctioned for an ex parte communication with an employee of a corporation unless the attorney actually knows the corporation and its employees are represented by an attorney in the matter at the time of the ex parte communication. *See Truitt v. Superior Court,* 59 Cal.App.4th 1183, 69 Cal.Rptr.2d 558, 97 Daily Journal D.A.R. 14815 (1997). Constructive or presumptive knowledge of representation is insufficient to bring the ex parte contact prohibition into play. *Id.* 59 Cal.App.4th at 1184, 69 Cal.Rptr.2d 558.

■ Here, Mr. Bayer knew in early October 1996 that the limited partners of New Hogan were represented by counsel against Terrebonne. Mr. Bayer admits in his Novem-

ber 7, 1997 Second Supplemental Declaration, filed under seal, that "As of October, 1996, I knew that New Hogan was represented by Mr. Hassen .... I NEVER speak with adverse parties whom I know to be represented by counsel." Bayer's Second Supp. Decl. (Nov. 7, 1997), ¶ 10. In his October 2, 1996 letter to Mr. Hassen, Mr. Bayer also states: "some of the Investors received limited partnership shares. In this regard, I have been consulted regarding an action to dissolve New Hogan Lake Investors and to remove the partnership's current general partner in the interim." Recognizing that some of the investors are limited partners, the law in California is clear that an attorney for a partnership represents its partners as well in matters concerning the partnership. *See Wortham & Van Liew v. Superior Court,* 188 Cal.App.3d 927, 233 Cal.Rptr. 725 (1987); *Responsible Citizens v. Superior Court,* 16 Cal.App.4th 1717, 20 Cal.Rptr.2d 756 (1993).

■ The right to title to the real property which forms the subject of the Terrebonne litigation is a matter for which New Hogan and its investor-limited partners were adequately represented by counsel. Nonetheless, Mr. Bayer continued to represent Terrebonne seeking to recover the property from New Hogan. He undertook representation of the New Hogan investors, including Buck Noel, a limited partner, whose interests were to clear title to the 652 acres. Under the guise of representing an aligned interest, Mr. Bayer sought from opposing counsel to learn and be kept informed of Mr. Hassen's legal and settlement strategy and insurance coverage analysis. In October 1996, Mr. Bayer communicated with Mr. Hassen, representing himself to be counsel for New Hogan investors. He did not disclose that Mr. Bayer had been previously engaged and was working as a legal consultant for Terrebonne and Mr. McCollum in this litigation. Despite the appearance of and an actual conflict of interest, Mr. Bayer continued to represent both Terrebonne and the New Hogan investors, who were adversaries in the same lawsuit and substantially related matters, the involuntary bankruptcy and the 1997 state lawsuit. Even after he discovered that Mr. Hassen's strategy was

for New Hogan to look to its investors in an effort to raise settlement monies to achieve a settlement at the expense of Terrebonne; knowing that Terrebonne's objective was to recover all of the real property. Mr. Bayer pursued the involuntary bankruptcy to liquidate New Hogan and compromise this case on Terrebonne's terms. As Judge McManus found, if successful, Mr. Bayer's actions in the name of New Hogan investors would have benefitted only Terrebonne, because once dissolved, New Hogan could not seek additional investor contributions in accordance with Mr. Hassen's strategy to fund the settlement, which in Mr. Hassen's legal opinion could be accomplished at Terrebonne's expense. Mr. Bayer sought to advance Terrebonne's interests, which were directly in conflict with the loyalty obligations he owed New Hogan investors, his new clients. This conflict was not adequately disclosed in writing, and could not be consented to by the affected clients, even after adequate disclosure. *See Flatt v. Superior Court*, 9 Cal.4th 275, 36 Cal.Rptr.2d 537, 885 P.2d 950 (1994), where the court held an attorney had no duty to advise a new or prospective client of potential adverse consequences of a case when the attorney determines that representation of the new or prospective client created an irremediable conflict with representation of an existing client.[20] Discussing the attorney's duty of confidentiality owing to an existing client, the court found:

> Where the requisite substantial relationship between the subject of the prior and the current representations can be demonstrated, access to confidential information by the attorney in the course of the first

representation (relevant, by definition, to the second representation) is presumed and disqualification of the attorney's representation of the second client is mandatory. . . .

*Id.* at 283, 36 Cal.Rptr.2d 537, 885 P.2d 950. Discussing the duty of loyalty owed by an attorney to his client, the court found:

> In evaluating conflict claims in dual representation cases, the courts have accordingly imposed a test that is more stringent than that of demonstrating a substantial relationship between the subject matter of successive representations. [footnote] Even though the simultaneous representations may have nothing in common, and there is no risk that confidences to which counsel is a party in the one case have any relation to the other matter, disqualification may nevertheless be required. Indeed, in all but a few instances, the rule of disqualification in simultaneous representation cases is a per se or 'automatic' one. [citing cases]

*Id.* at 284–5, 36 Cal.Rptr.2d 537, 885 P.2d 950.

 Here, the dual and concurrent representations undertaken by Mr. Bayer are so substantially related that even if Mr. Bayer had fully and adequately disclosed the nature of the actual conflict of interest involved in representing both Terrebonne's and the New Hogan investors' interests in matters relating to the subject real property, the conflict could not have been waived because it would have resulted in a breach of both the attorney's duty of confidentiality and the duty of

---

20. In *Flatt,* the real party in interest, Daniel was represented by attorney Hinkle in business transactions in 1980. Following an unfavorable judgment in marital dissolution proceedings in 1989, Daniel sought the advice of attorney Flatt concerning Hinkle's mishandling of the case. Flatt held an initial consultation meeting with Daniel, where Daniel disclosed confidential information regarding the 1980 business transaction structured by Hinkle. Flatt determined that Daniel had a legal malpractice claim against Hinkle. One week later, Flatt advised Daniel she could not represent him against Hinkle because her law firm represented Hinkle in an unrelated matter. Flatt failed to advise Daniel of the two year statute of limitations applicable to attorney malpractice actions. Two years later, in 1991, Dan-

iel filed a lawsuit against Hinkle stemming from the 1980 transaction, and against Flatt and her law firm for failing to advise him about the statute of limitations bar. The trial court denied Flatt's motion for summary judgment finding triable issues as to whether an attorney-client relationship was formed between Flatt and Daniel. The Court of Appeal affirmed. The Supreme Court reversed in an opinion written by Justice Arabian, with one dissenter. The court instead found that even if an attorney-client relationship existed between Flatt and Daniel, Flatt's existing duty of loyalty to Hinkle, required her to sever any professional relationship with Daniel promptly upon learning of the conflict. *Id.* at 281, 36 Cal.Rptr.2d 537, 885 P.2d 950.

loyalty owing to his first client, Terrebonne.[21] Moreover, the fact that Mr. Bayer attempted to currently represent two clients whose interests are diametrically opposed, without fully disclosing and obtaining all interested clients' express agreements in writing to waive the conflict makes this instance of attorney misconduct even more troubling. Mr. Bayer's representation of Terrebonne, his first client, and of the New Hogan investors, his second client, were more than substantially related, they were in the same case. His disqualification was mandatory under the rule expressed in *Flatt* and other cases. *See, e.g., Rosenfeld Construction Co. v. Superior Court,* 235 Cal.App.3d 566, 575, 286 Cal.Rptr. 609 (1991); *Henriksen v. Great American Savings & Loan,* 11 Cal.App.4th 109, 117, 14 Cal.Rptr.2d 184 (1992); *Galbraith v. State Bar,* 218 Cal. 329, 332–333, 23 P.2d 291 (1933); *In re Complex Asbestos Litigation,* 232 Cal.App.3d 572, 283 Cal.Rptr. 732 (1991).

21. *Flatt* recognized:

There are, of course, exceptions even to this rule. The principle of loyalty is for the client's benefit; most courts thus permit an attorney to continue the simultaneous representation of clients whose interests are adverse as to unrelated matters provided full disclosure is made and both agree in writing to waive the conflict. (*See, e.g.,* Steinberg & Sharpe, Attorney Conflicts of Interest: The Need for a Coherent Framework (1990) 66 Notre Dame L.Rev. 1, 3, fn. 7, and materials cited.) But this class of cases is a rare circumstance, typically involving corporate clients, and overcoming the presumption of 'prima facie impropriety' is not easily accomplished. (Citations.) *Id.* at 285, n. 4, 36 Cal.Rptr.2d 537, 885 P.2d 950.

22. The decisions to disqualify Messrs. Bayer and McCollum from further representation of any party in this case and to sanction their misconduct are further supported by the Ninth Circuit's decision in *Damron v. Herzog,* 67 F.3d 211 (9th Cir.) *cert. denied,* 516 U.S. 1117, 116 S.Ct. 922, 133 L.Ed.2d 851 (1996), where the court found that an attorney breached his ethical duty of loyalty to a former client by representing a current client in a matter substantially related to the former representation. In *Damron,* decided under Idaho rules of professional conduct, the attorney represented the first client in a stock purchase agreement in 1982 for the sale of a funeral and cemetery business. In 1991, the attorney advised new clients, the purchasers of the funeral business, to discontinue payment under the stock purchase agreement. *Damron,* the seller and original client, sued the attorney, Herzog, in district court in the District of Idaho.

The conflicted legal representation came about after Mr. Bayer followed Mr. DeGravel's suggestion that a settlement could be more easily achieved by going directly to the New Hogan investors, without involving the partnership or Mr. Hassen. Mr. Bayer then contacted New Hogan investors directly to persuade them to dissolve the partnership, and elicited confidential information from Mr. Hassen, holding himself out as attorney for the New Hogan investor group. This conduct breached duties of loyalty and confidentiality inherent in the attorney-client relationship. Mandatory disqualification of Mr. Bayer and Mr. McCollum and their law firms was compelled[22] and should have been,

> evident [to the attorneys themselves], [and] even (or perhaps especially) to the nonattorney. A client who learns that his or her lawyer is also representing a litigation adversary, even with respect to a matter wholly unrelated to the one for which

The district court granted the attorney's motion for summary judgment on the ground that Idaho law did not recognize a duty from attorneys to former clients beyond the duty of confidentiality. The Ninth Circuit reversed: "we find in the common law a continuing duty owed by attorneys to former clients not to represent an interest adverse to a former client on a matter substantially related to the matter of engagement. When such a duty is breached, the former client may bring a cause of action at law." 67 F.3d at 213.

The Ninth Circuit concluded that when an attorney agrees to represent new clients in a matter substantially related to representation of the former client, "the attorney-client relationship reattaches. Under such circumstances, ... the duty of loyalty must continue after the representation is complete in the same way the duty of confidentiality continues." *Id.* Moreover, the court found "that just as the attorney-client relationship remains intact for purposes of a continuing duty of confidentiality, so does it remain intact for purposes of a continuing duty of loyalty with respect to matters substantially related to the initial matter of engagement." *Id.* at 214.

Mr. Bayer as Terrebonne's counsel, could not benefit from use of the confidential information he acquired. "[W]hen an attorney engages in a conflict of interest on the same matter, he or she is in a position to act on the confidential information learned from the relationship with the first client, whether or not that information is actually disclosed or acted upon in advising the new client." *Damron,* 67 F.3d at 215 (citing *Maritrans GP, Inc. v. Pepper, Hamilton & Scheetz,* 529 Pa. 241, 254, 602 A.2d 1277 (1992)).

counsel was retained, cannot long be expected to sustain the level of confidence and trust in counsel that is one of the foundations of the professional relationship.

See *Flatt*, 9 Cal.4th at 285.

Mr. Bayer did not adequately disclose before October 1996, when he first contacted the New Hogan investors, the nature of the existing, actual conflict of interest, that he represented Terrebonne and the McCollum law firm as a legal consultant in the dispute that underlies this lawsuit, and that he had been referred to the New Hogan investors by Terrebonne's principal, Mr. DeGravel to attempt to drive a wedge between New Hogan's general partner and New Hogan's investors.[23] Mr. Bayer also did not provide evidence that both the investors and Terrebonne voluntarily and knowingly consented to the conflict after having consulted independent counsel. A careful review of the "disclosure letters" of November 9, 1996 and December 18, 1996, provided by Mr. Bayer to the investors shows that an incomplete factual description of the litigation and the nature of his conflict was provided. There is almost no historical analysis of the conflict between Terrebonne and New Hogan. No mention is made that Terrebonne was pursuing a fraud ab initio theory, that the court might not find New Hogan a bona fide purchaser, or that Mr. Bayer's first loyalty was owed to Terrebonne and the McCollum law firm, who were existing clients when Mr. Bayer sought to represent New Hogan investors. The investors could not have understood the extent of the conflicts that existed between Terrebonne, its lawyers, and New Hogan's equity and note investors, based on Mr. Bayer's inadequate disclosure letters.

Mr. Bayer failed to inform the investors of all facts and the conflicting legal positions of the parties, not to mention the effect of an involuntary bankruptcy on New Hogan. Nowhere did Mr. Bayer inform noteholders that they would lose their liquidation preferences if their notes were avoided in bankruptcy. Mr. Bayer's letter failed to mention that in litigation in this court, New Hogan believed a favorable settlement of the overall case could be reached, at the expense of Terrebonne. On the facts as they then existed, the same lawyer could not represent Terrebonne and the New Hogan investors, whether limited partners or noteholders.

Mr. Bayer states in his declaration that he attempted to set forth the facts as he "believed would enable the investors to make an informed decision as to Bayer's representation of them." Bayer Decl., ¶ 4, p. 2:7–9. He states "[a]t the time, the noteholders, expressed to me that they did not believe there to be a conflict of interest, since there [sic] desire was to make a claim upon New Hogan's title insurance carrier or failing this, to negotiate directly with Terrebonne as to a settlement of the within litigation and imposition of the property at issue." *Id.*, p. 2:9–12. This, of course, is not only overly simplistic, it is disingenuous. It is not for the client to conduct legal analysis and conclude that no conflict of interest exists. Rather, it is incumbent upon the attorney to disclose all facts of the prospective conflict and to thoroughly advise the client, in clear language, of the potential or, in this case the actual conflict of interest which is present or could arise based on differing possible scenarios in the development of the litigation. While Mr. Bayer asserts his good intention in the December 18, 1996 letter by urging the investors to seek independent legal advice, this is

**23.** Mr. De Gravel stated in his declaration, filed May 6, 1997, in opposition to the motion to disqualify Terrebonne's attorneys, the following: In the Fall of 1996, I introduced Mr. Kenneth Bayer to the creditors who ultimately filed the involuntary bankruptcy petition in *In re New Hogan Lake Investors*, Case No. 96–25473–C–7. I made this introduction because of my desire to negotiate a settlement of the within litigation as it pertains to New Hogan Lake Investors. Previously, attempts to settle had proven futile. I believed then, and continue to believe now, that Terrebonne stands the best chance of negotiating a settlement with other creditors of New Hogan, as opposed to New Hogan itself. Terrebonne deems the placing of New Hogan into involuntary bankruptcy to be consistent with Terrebonne's interests. When a Chapter 7 trustee is appointed over the estate of New Hogan Lake Investors, my intention is to negotiate with the other creditors to formulate for presentation to the Chapter 7 trustee, a joint plan for the disposition of the partnership's assets for the benefit of its creditors. De Gravel Decl., ¶¶ 2, 3, 5.

simply "too little, too late." By October 1996, Mr. Bayer had already undertaken representation of the New Hogan investors as so-stated to Mr. Hassen. Mr. Bayer has, at no time during the submission of the motion to disqualify, or in the order to show cause proceedings offered signed informed written waivers by the New Hogan investors *and* Terrebonne's written, knowing consent, acknowledging the potential and actual conflicts.

In Mr. Bayer's Supplemental Declaration (filed October 14, 1997), Mr. Bayer sets forth a list of limited partnerships in which Mr. Boggs is the general partner. Mr. Bayer states the investors' decision to place New Hogan in bankruptcy was in part based on "the larger context of pension fund assets being tied up in . . . real estate limited partnerships." Bayer Supp. Decl. (Oct. 14, 1997), p. 2:11-13. In his November 7, 1997 Second Supplemental Declaration, Mr. Bayer also appends a chart which purports to show the interrelatedness of the limited partnerships managed by Mr. Boggs. Review of Mr. Bayer's chart does not reflect New Hogan's holdings or interest in other ventures. Contrary to Mr. Bayer's assertions, the chart does not show that New Hogan loaned money to any of the related partnerships. Unless New Hogan is a creditor in these other partnerships, the fact that CRE Equity Investors is involved in other partnerships would not provide assets to New Hogan's bankruptcy estate. This also ignores that, assuming all these facts to be true, an actual conflict then existed between Terrebonne and New Hogan, which barred simultaneous representation of any New Hogan limited partner by a lawyer for Terrebonne.

Mr. Bayer's supplemental briefing also proves how he has compromised his clients' interests. He asserts that he prepared a letter in December 1996 for Mr. McCollum's signature, which was sent to Mr. Hassen. The letter discusses a proposed settlement between Terrebonne and New Hogan. Here, Mr. Bayer exclusively represented Terrebonne's interests against the interests of New Hogan. The settlement proposal suggests lot line adjustments, grants of easements and title to portions of the property, subject to certain conditions.[24] Under the proposed settlement, New Hogan was required to seek participation of its investors in order to complete the settlement as structured by Messrs. Bayer and McCollum.

In the meantime, Mr. Bayer had advocated the initiation of involuntary bankruptcy proceedings against New Hogan by those same investors, which terminated the ability of New Hogan to raise funds from investors to contribute to a pro-New Hogan settlement proposal to purchase Terrebonne's senior deed of trust. Mr. Bayer had to convince the New Hogan investors that the settlement which favored Terrebonne, was in the investors' best interests. Through Mr. Hassen, New Hogan was seeking a settlement by which New Hogan would buy the entire property, which contemplated contribution of funds by New Hogan investors. As an advocate for Terrebonne and officer of the court, Mr. Bayer could only advocate the best possible outcome for his client, Terrebonne. He could not simultaneously represent the conflicting interests of New Hogan investors as to the Terrebonne litigation. Mr. Bayer and Mr. McCullom could not objectively define the "best" settlement for New Hogan investors. The tunnel vision of the disqualified attorneys that there was only one reasonable settlement of this case, that favored Terrebonne, proves why Mr. Bayer could not represent New Hogan investors.

E. *IS THERE SUFFICIENT EVIDENCE TO FIND SUBJECTIVE BAD FAITH ON THE PART OF THE DISQUALIFIED ATTORNEYS TO WARRANT SANCTIONS?*

Sanctions are warranted when an attorney has shown subjective bad faith by "knowingly or recklessly rais[ing] a frivolous argument or argu[ing] a meritorious claim for the purpose of harassing an opponent." *Trulis v. Barton,* 107 F.3d 685, 694 (9th Cir.1995)

24. Mr. Bayer also drafted settlement letters on behalf of Terrebonne in June 1997 in which he similarly represents only Terrebonne's interests in accomplishing a resolution of the title dispute issue which heavily favors Terrebonne's interests. *See* Exh. G to New Hogan's Additional MP & A (Nov. 7, 1997).

(quotations omitted) (attorney's intentional disregard of client's express instructions and continued insistence that he represented persons who he was not authorized to represent, was reckless as a matter of law and supported award of sanctions).

The Ninth Circuit has sanctioned attorney misconduct for witnessing tampering as a breach of the attorney's ethical duty not to tamper with material witnesses for the adverse party. *Erickson v. Newmar Corp.*, 87 F.3d 298 (9th Cir.1996). In *Lockary v. Kayfetz*, 974 F.2d 1166, the attorney failed to follow the clients' instructions and dismiss the lawsuit after a distribution plan in a related bankruptcy proceeding had been reached disposing of plaintiffs' rights. An award of sanctions against the attorneys for acts which degrade the judicial system was not an abuse of the district court's discretion.

■ The disqualified attorneys' conduct must be viewed in its entirety. *Salstrom*, 74 F.3d 183 (finding of subjective bad faith based on combined factors of the number and length of the pleadings, the timing involved in many of the filings, and the substance of the claims asserted, converting a "simple straightforward debt collection action into a full-fledged assault," was sufficient to justify award of sanctions).

Mr. Bayer began working as a consultant for Terrebonne and the McCollum firm in September 1996. Mr. Bayer concluded that New Hogan should be forced into involuntary bankruptcy and dissolved, but understood that Terrebonne could not accomplish this because it was not a creditor of New Hogan. Mr. Bayer urged a group of New Hogan investors and limited partner to bring an involuntary bankruptcy petition against New Hogan to benefit Mr. Bayer's undisclosed client, Terrebonne. Mr. Bayer did not disclose to the investors at the outset his role as an attorney-consultant for Terrebonne and its attorneys. He did not disclose the full potential for adverse consequences to New Hogan, its partners and investors, including loss of the noteholders' liquidation preference in an involuntary bankruptcy. He did not provide an objective evaluation of settlement between Terrebonne and New Hogan of the pending litigation in which the investors would contribute monies to New Hogan, not to settle on Terrebonne's terms, but to buy the entire property for New Hogan. He did not explain the risk that if Terrebonne succeeded in its effort to recover the 652 acres, New Hogan would be assetless. He did not disclose that he had learned New Hogan's confidential litigation strategy by misrepresenting his status to Mr. Hassen, which aided opposition to New Hogan's pending summary judgment motion and compromised New Hogan's ability to negotiate a favorable settlement.

Throughout this litigation, Mr. McCollum and his pre-Bayer law firm have taken the position that Thousand Hills obtained the disputed 652 acres of real property by fraud and has no enforceable interest or right to the 652 acres. They sought to void, ab initio, the transfer of title to Thousand Hills and the derivative title of New Hogan. Terrebonne also takes the position that New Hogan must satisfy the outstanding tax obligations owing on all 2,824 acres. Terrebonne's litigation position has sought to divest New Hogan of title to the real property.[25] After Mr. Bayer was referred to Mr. Hassen in October 1996, Terrebonne's position changed in the disqualification proceedings, to include, *inter alia*, an argument that New Hogan's title would not be voided because it was a bona fide purchaser.

Mr. Bayer did not disclose he was an attorney for Terrebonne for almost two months after he began communications with Mr. Hassen. By all indications, the October 2, 1996 letter regarding the New Hogan investors, if it was received by Mr. Hassen, was "friendly" rather than adversary, Mr. Bayer gave no indication his "New Hogan

---

**25.** In New Hogan's Additional MP & A, filed November 7, 1997, Mr. Hassen attaches as Exhibits B, C, D, E, F, and G, a correspondence trail between himself and Terrebonne's attorneys which shows that Terrebonne has, through Mr. McCollum, as late as the spring of 1997, asserted a right to the 652 acres, which the disqualified attorneys in the order to show cause proceedings now contend Terrebonne has recognized "should be abandoned." They also now characterize the relief sought in the 1997 state case against New Hogan as a "mistake."

# 1072

clients" were not aligned with New Hogan in the Terrebonne litigation.[26] He certainly did not disclose that he was recommending an involuntary bankruptcy for New Hogan. In late November 1996, Mr. Bayer engaged Mr. Hassen in a detailed discussion on the merits of the case, *inter alia,* evaluation of settlement positions, strategy as to the title insurer, and legal merits of the foreclosure claim. Not until the end of the conversation did Mr. Bayer disclose he might join the McCullom law firm or that he then represented Terrebonne. Mr. Hassen contends he disclosed such confidential information to Mr. Bayer only because Mr. Bayer failed to make any mention of his legal representation of Terrebonne. Mr. Hassen's explanations are logical and credible and in accordance with Mr. Boggs' instructions to him to provide information to all New Hogan investors and their attorney. The disqualified attorneys' evidence does not refute Mr. Hassen's declaration. Confidential information regarding the Terrebonne litigation was obtained by Mr. Bayer from Mr. Hassen, while Mr. Bayer represented Terrebonne, under the guise he represented the interests of New Hogan investors in settlement of Terrebonne's case in this court. Mr. Bayer's conduct in learning the confidential litigation and settlement strategy of New Hogan and his concealment of his representation of Terrebonne was purposeful. Uncontroverted evidence has established that Mr. Bayer had already determined to join the McCollum law firm when he conducted his November 1996 telephone conversation with Mr. Hassen. This course of conduct demonstrates subjective bad faith warranting sanctions. Mr. McCollum has adopted and ratified Mr. Bayer's actions, in open court upon specific inquiry to him.

After Mr. Bayer's discussions with Mr. Hassen, the McCollum lawyers began to assert that New Hogan could retain the 652 acres, if Terrebonne were permitted to recover either a deficiency judgment against New Hogan or rents earned for its beneficial grazing use of the property. These positions were legally meritless. The disqualified attorneys' explanation for the changes in strategy is not convincing. Mr. McCollum describes his extensive experience as a veteran business attorney and negotiator. Mr. Bayer is also an experienced attorney in business and bankruptcy law. However, that this litigation has not been effectively prosecuted due to inept and over-aggressive pleading by Terrebonne, has been raised in open court more than once with the McCollum lawyers. Specifically, pleading a spurious RICO claim over 27 acres of rangeland, valued at $10,000 to $20,000, has wasted the time and resources of the court and the parties.

■ The manner in which the disqualified attorneys obtained information about New Hogan's intentions in the law suit, by joining the conflicted interests of a current client with opposing parties and potential adversaries; keeping secret their true identity of interests from opposing counsel to gain information and to institute a dubious involuntary bankruptcy proceeding against New Hogan, their adversary in litigation, followed by filing a duplicative state court action to recover the 652 acres from New Hogan; constitutes substantial evidence of subjective bad faith and vexatiously multiplying these proceedings which delayed resolution of this case, even after Terrebonne was called to account in proceedings on motions to dismiss its complaint and for summary judgment.

There is substantial evidence that the disqualified attorneys did not and could not have received consent of all affected parties before Mr. Bayer undertook to represent or continued to represent these conflicting interests. Mr. Bayer failed to adequately advise New Hogan investors of the differences in their positions as partners, who were already represented by counsel in the litigation, and noteholders, who were creditors with liquidation preferences. The disqualified attorneys' conduct includes filing a law-

---

**26.** The October 2, 1996 letter states in part:
Owing to the partnership's foreclosure under Thousand Hills Development Corp.'s note and deed of trust on or about October 22, 1992, the partnership acceded to Thousand Hills Development Corp.'s ownership interest in the real property in question. Pursuant to the collateral assignment, the Investors also acceded to this ownership interest.
*See* Exh. B to Bayer's Third Supplemental Declaration, filed November 24, 1997.

suit in state court after their lawsuit failed to succeed in this court, reasserting the quiet title issue against New Hogan, which led to the disqualification motion. There is substantial evidence that the disqualified attorneys' conduct is so legally unjustified as to be reckless. It reaches the degree of subjective bad faith required for a finding of attorney sanctions under 28 U.S.C. § 1927. But for such conduct, the disqualification proceedings, prolongation of summary judgment, and these orders to show cause proceedings would not have been necessary. New Hogan has been required to expend substantial effort and resources on matters that should never have arisen, if the disqualified attorneys had properly analyzed the law and facts and not sought improper advantages by representing parties with legally conflicting interests. Sanctions are also justified under the Local Rules of the Eastern District and the court's inherent power to sanction attorney misconduct.

### F. NEW HOGAN'S REQUEST FOR AN AWARD OF SANCTIONS AGAINST THE DISQUALIFIED ATTORNEYS

New Hogan moves for monetary sanctions against the disqualified attorneys for expenses incurred in bringing the motion to disqualify. An award of attorney's fees is appropriate, New Hogan contends, under the court's inherent power to control the conduct of attorneys appearing before it. New Hogan asserts it expended some $30,216.02 in prosecuting the motion to disqualify. Additionally, New Hogan seeks $29,385.44 for fees and costs incurred in being forced to defend against the involuntary bankruptcy petition which was dismissed by Judge McManus, United States Bankruptcy Court.

The disqualified attorneys assert the court's order to show cause was only to address breach of the Eastern District's rules. This narrow reading of the court's order is again disingenuous. In both the memorandum decision and the order granting the motion to disqualify, the court ordered the disqualified attorneys "to show cause, if any they have, why *appropriate remedies and sanctions* should not be imposed against them for their violations of the California Rules of Professional Conduct and the Local Rules of the Eastern District, L.R. 83–180." *See* Decision at p. 30:12–16 (emphasis added). Contrary to the disqualified attorneys' assertion that it would be "vindictive and Draconian for the Court to impose in addition a monetary sanction of the magnitude suggested by New Hogan's counsel," monetary sanctions are justified under the arsenal of sanctions available to the court, to compensate for needless attorneys fees and expenses caused by the altogether avoidable proceedings which resulted from the disqualified attorneys' reckless and improper conduct.

On September 22, 1997, the Judge McManus heard New Hogan's motion for attorneys' fees and costs to recover in the bankruptcy action. Judge McManus awarded New Hogan $23,051.65 in attorney fees and costs, against the disqualified attorneys and their clients, having determined such fees and costs were incurred in successfully defending against the involuntary petition. The disqualified attorneys assert New Hogan should not be permitted to recover attorney fees and costs incurred in defending the bankruptcy proceeding because such a duplicative award would be punitive.[27]

---

**27.** A district court may sanction abuses occurring beyond the courtroom or before other tribunals. *See Chambers*, 501 U.S. at 57; *Western Systems, Inc. v. Ulloa*, 958 F.2d 864, 873 (9th Cir.), *cert. denied*, 506 U.S. 1050, 113 S.Ct. 970, 122 L.Ed.2d 125 (1993). A court may impose sanctions "even in the absence of subject matter jurisdiction." *Ilan–Gat Engineers, Ltd. v. Antigua Int'l Bank*, 659 F.2d 234, 239 (D.C.Cir.1981).

The imposition of attorney sanctions for a violation of ethical rules need not be punitive in nature in order to accomplish the competing goals of a sanctions award to compensate opposing counsel and to deter attorney misconduct. Although the bankruptcy court did not consider whether Mr. Bayer engaged in professional misconduct in awarding New Hogan attorney's fees, an additional award of fees in this case would be punitive. While the bankruptcy judge's rulings provide an additional basis for awarding monetary sanctions against the disqualified attorneys, such an award serves no purpose in this instance. New Hogan's request for attorneys fees and costs incurred in defending against the involuntary bankruptcy petition is DENIED.

The disqualified attorneys assert no evidence demonstrates their conflict of interest in this case was a "cause in fact" for filing the involuntary petition against New Hogan in the bankruptcy court. The disqualified attorneys are incorrect. The improper dual representation of Terrebonne's and the New Hogan investors' interests resulted in part from Mr. DeGravel's view that if Terrebonne could get around New Hogan's general partner and New Hogan's attorneys of record in this case, the case could be settled directly with New Hogan investors. This objective caused the filing of the involuntary bankruptcy petition and delayed resolution of this case. Terrebonne could not place New Hogan into involuntary bankruptcy proceedings because it is not a creditor of New Hogan. It was only through the investors, whom the disqualified attorneys came into contact with, through Terrebonne's principal Mr. DeGravel, and by virtue of Mr. Bayer's improper contacts with New Hogan's investors and conversations with Mr. Hassen, that Mr. Bayer was able to muster enough information with which to initiate the involuntary proceedings. The Terrebonne theory was that with a successful bankruptcy petition and forced sale of New Hogan's interest in the property, Terrebonne could effectively end this litigation by foreclosing on its deed of trust on the remaining acreage without obtaining a lot line adjustment. The latter theory could only be valid if Terrebonne was sole owner of all the real property, obviating the need for a lot line adjustment. Judge McManus correctly found that "[t]he involuntary petition could benefit Terrebonne but has no practical benefit to the Petitioners. The involuntary Petition is being litigated primarily for the benefit of Terrebonne." *See* Findings of Fact and Conclusions of Law at p. 5. The two cases are substantially related.

The disqualified attorneys' conduct rises to the level of subjective bad faith necessary to support appropriate sanctions. A failure to sanction Mr. Bayer and Mr. McCollum would be an abdication of the court's responsibility to address and appropriately deal with obvious violations of the Rules of Professional Conduct and ethical canons. The court finds that the conduct of the disqualified attorneys

has unnecessarily multiplied the proceedings and delayed the resolution of this case. The court finds Mr. Bayer's conduct, which was undertaken with the knowledge of and expressly ratified by Mr. McCollum, is vexatious because it was intended to interfere with New Hogan's ability to defend itself in this lawsuit by, *inter alia:* (1) forcing New Hogan to defend against an involuntary bankruptcy petition filed to benefit Terrebonne, an adverse party with a competing interest in the subject property, but without the necessary creditor status to maintain such an involuntary bankruptcy proceeding; (2) requiring New Hogan to answer to a new state lawsuit mirroring in substantial part claims, some of which have already been dismissed and the balance have not met with success in this court, in an effort to relitigate and prolong resolution of title issues to the disputed land; and (3) unduly prolonging this litigation by continuing to assert meritless legal positions. Monetary sanctions are appropriate to reimburse New Hogan for the attorneys fees incurred in litigating the ethical issues requiring disqualification, under 28 U.S.C. § 1927 and Eastern District of California, Local Rule 83–284; and alternatively, the court's inherent power.

The court further finds: 1) Mr. Bayer's undertaking to represent New Hogan investors without fully and adequately disclosing to them his relationship as Terrebonne's attorney and with Terrebonne's attorneys is a conflict in violation of his fiduciary duty to those investors of full disclosure; 2) communicating about this case with a New Hogan limited partner, Mr. Noel, already represented in this litigation by counsel for the partnership without advance notice and consent of Mr. Hassen, violates Cal. Rules of Prof. Conduct 2–100; 3) wrongfully eliciting and obtaining confidential attorney-client and attorney work-product materials from Mr. Hassen based on Mr. Bayer's calculated omission to disclose his representation of Terrebonne and his true allegiance was in bad faith and unethical; 4) utilizing confidential information improperly obtained to advance the position of his client, Terrebonne, in the litigation was a conflict of interest, by analogy to Rule 3–310(E); 5) initiating an

involuntary bankruptcy proceeding against New Hogan based, in part, on confidential information obtained from his illicit contact with Mr. Hassen was a conflict of interest and breach of the duty of loyalty to New Hogan investors; 6) all this conduct unnecessarily multiplied the proceedings in this case and caused New Hogan to incur unnecessary litigation costs and attorneys fees to protect its interest in this litigation, to defend against the involuntary bankruptcy petition, and to resolve the issue of continued legal representation of Terrebonne by Mr. McCollum and Mr Bayer and their law firms. Extensive legal research to develop the pleadings and evidence was required to address Mr. Bayer and Mr. McCollums' actions. An expert on attorney ethics was hired to investigate and review the propriety of the disqualified attorneys' conduct and to offer expert analysis to the court. Three separate court hearings were conducted over an eight month period.

New Hogan is entitled to recover reasonable attorney fees and costs incurred in prosecuting the disqualification motion because the conduct of the disqualified attorneys caused unnecessary and vexatious multiplication of this litigation and has needlessly delayed its resolution. It has created a lawsuit within a lawsuit. Attorney fees are not awarded for defending against the involuntary bankruptcy petition, although that has also prolonged the resolution of this case. The bankruptcy court has already ordered the disqualified attorneys and their clients to pay attorney fees for the wrongful involuntary bankruptcy petition. Although justified, attorneys fees are not awarded for litigating the sanctions issue to avoid double recovery which would be unnecessarily punitive.

In *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the Supreme Court held that the most useful starting point for determining the amount of a reasonable attorneys fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This is commonly known as the lodestar figure. Other considerations may also be relevant in determining reasonable attorney fees. *See Stewart v. Gates,* 987 F.2d 1450, 1453 (9th Cir.1993), discussing relevant factors which district courts may consider in determining the number of hours reasonably expended, the reasonable hourly rate and the resultant basic fee (citing *Kerr v. Screen Extras Guild,* 526 F.2d 67 (9th Cir.1975), *cert. denied,* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976)).[28]

To substantiate his request for attorneys fees, Mr. Hassen submitted itemized billings of the time spent by him and members of the Miller, Starr law firm preparing for the disqualification motion. The billings detail the name of each timekeeper, the amount of time spent of a particular task, the task involved, and the amount billed to the client. A similar documenting of costs is included. The rates charged are reasonable and within the range charged by attorneys of comparable competence and experience who practice before the court. The disqualified attorneys have not objected to the billing statements.

The lodestar equation set forth in *Hensley* requires the court to determine whether the amount charged is a reasonable hourly rate and whether the time expended on the particular legal task is reasonable as well. *See also Stewart,* 987 F.2d at 1453. The proper calculation of the amount of sanctions to award New Hogan utilizes the lodestar calculation. However, after reviewing the billings submitted by New Hogan, the hours expended in preparing for the disquali-

---

**28.** The *Kerr* factors cited with approval in *Stewart* are the following:

1. The time and labor required.
2. The novelty and difficulty of the questions.
3. The preclusion of other employment by the attorney due to the acceptance of this case.
4. The customary fee.
5. Time limitations imposed by the client or the circumstances.
6. The amount at stake and the results obtained.
7. The experience, reputation and ability of the attorneys.
8. The "undesirability" of the case.

*See* 987 F.2d at 1453. *Stewart* recognized, however, that the *Kerr* factor, "whether the fee is fixed or contingent" is not to be considered in determining the basic fee. *Id.* (citing *Davis v. City and County of San Francisco,* 976 F.2d 1536, 1549 (9th Cir.1992), vacated in part, 984 F.2d 345 (9th Cir.1993)).

fication motion by the Miller, Starr firm have been adjusted. There is no reason, however, to adjust the hourly rates by each timekeeper, which are reasonable in light of the experience of the attorneys and the nature of the legal issues involved. The lodestar calculations are as follows:

| TIMEKEEPER | RATE | HOURS | AMOUNT |
|---|---|---|---|
| Michael J. Hassen | $ 230 | 54.95 | $ 12,638.50 |
| Richard G. Carlston | 240 | .75 | 180.00 |
| Janine C. Ogando | 155 | 36.80 | 5,704.00 |
| Sharon L. Thomas | 85 | 2.30 | 195.50 |
| TOTAL | | | $ 18,718.00 |

■ The costs sought to be recovered by New Hogan, $4,555.02, include 1) travel expenses incurred by Mr. Hassen for attending the May 9, 1997 hearing on the motion to disqualify, $109.40; 2) travel expenses incurred by Mr. Hassen for attending the May 12, 1997 hearing on New Hogan's motion for summary judgment and Terrebonne's cross-motion to dismiss, $109.40;[29] 3) fees charged by professional process server services, $1,325.00, for filing documents;[30] 4) professional services of Mr. Vapnek, an attorney with the law firm Townsend, Townsend and Crew, $2,989.82; and 5) travel expenses incurred by Mr. Hassen on July 8, 1997, $21.40.[31] The reasonable recoverable expenses are reduced to $3,099.22. The total award of attorneys fees and costs to New Hogan is $21,817.22. Attorneys' Bayer and McCollum and their law firms shall be jointly and severally liable to pay this award.[32]

Regrettably, the amount of this award is justified because the disqualified attorneys engaged in deceptive and unethical practices to advance the litigation position of Terrebonne, their primary client, as explained in substantial detail in this decision and in the memorandum decision granting the motion to disqualify. This unfortunate case is an aberration in the practice of attorneys before this court. What is of highest concern is that neither Mr. Bayer nor Mr. McCollum recognize that their conduct crossed the line, nor that their conduct, at minimum gave the appearance of conflict; and actually violated the Rules of Professional Conduct, or that there is even any problem with respect to the manner in which they prosecuted Terrebonne's case. Their strenuous response to these conflict issues and the order to show cause has been first, to categorically deny even the appearance of impropriety; then, when confronted with direct evidence, they said, "perhaps we were mistaken;" and finally they assert that the court lacks understanding of their conduct and conducted this review of their conduct for some unidentified vindictive purpose. To the contrary, Mr. Bayer has never before appeared in this court nor does the court have any prior knowledge of Mr. Bayer. The court has had no prior adverse experience with Mr. McCollum. Only the facts placed before the court by the parties in these proceedings and the history of and the proceedings themselves have been considered.

Sanctions are also warranted under the inherent power of the court to control the practice of attorneys before the court to ensure strict adherence to rules of professional conduct and ethics. The totality of the sanctioned conduct is also interpretable as an interference with the administration of justice under Eastern District of California Local Rule 83–180(e). Although more extensive sanctions could be imposed, to avoid an overly punitive result, Mr. Bayer, Mr. McCullom,

---

29. This expense was not incurred in prosecuting the disqualification issue. This expense is not recoverable.

30. The court finds that the expenses incurred by New Hogan for utilizing the services of professional process servers is not reasonably recoverable as an expense resulting from the disqualified attorneys' conduct in this case.

31. There was no July 8, 1997 hearing on the disqualification motion. Costs incurred by New Hogan for its attorneys attending this hearing is not awarded as not essential to the proceedings.

32. The client Terrebonne was not included as a responding party in the order to show cause, so the award of sanctions is not as against Terrebonne as well. The evidence as to the bad faith of the client, plaintiff Terrebonne is sparse. According to Mr. Bayer, Terrebonne's principal, Mr. DeGravel gave him information about New Hogan investors which precipitated or encouraged pursuit of the involuntary bankruptcy against New Hogan. The evidence does not show the full extent to which the plaintiff knowingly participated in the attorneys' unethical conduct. Awarding sanctions against Terrebonne for the disqualified attorneys' misconduct is not justified on the facts of this case.

and their law firms, jointly and severally shall pay monetary sanctions in the amount of $21,817.22, to reimburse New Hogan for attorneys fees and expenses incurred in litigating the attorney disqualification issue, which unnecessarily multiplied the proceedings in this case.

## V. CONCLUSION

For all the reasons stated, for violation of California Rules of Professional Conduct, made applicable by Eastern District of California Local Rule 83–180(e), 28 U.S.C. § 1927, Eastern District of California Local Rule 83–184, and the Court's inherent power, sanctions are awarded as follows:

Mr. Bayer and Mr. McCollum and their law firms, McCollum, Bayer & Bunch and Bayer, Cutsinger & Lopez, jointly and severally, shall pay to New Hogan monetary sanctions to partially compensate for its reasonable attorneys fees and costs incurred in litigating the disqualification issues, the amount of $21,817.22.

SO ORDERED.